In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1546

ARC WELDING SUPPLY CO, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

AMERICAN WELDING & GAS, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:16-cv-00173-RLY-MPB — **Richard L. Young,** *Judge*.

ARGUED SEPTEMBER 26, 2018 — DECIDED FEBRUARY 14, 2019

Before EASTERBROOK, ROVNER, and ST. EVE, *Circuit Judges*.

ROVNER, *Circuit Judge*. This case arises from an Asset Purchase Agreement (the "Agreement") entered into in October 2014 between the plaintiffs, ARC Welding Supply Co. and its owner Charles McCormick (collectively "ARC"), and the defendant American Welding & Gas, Inc. ("American"). ARC was a distributor of compressed gases and welding supplies in Vincennes, Indiana, and sold substantially all of its assets to American including its stock of asset cylinders. ARC filed

a complaint alleging that American breached the terms of the Agreement for the purchase of the asset cylinders, and American filed a counterclaim for breach of contract. Following a bench trial, the district court entered judgment in favor of American and awarded damages in the amount of $33,765.52 plus interest, and ARC now appeals.

We take the facts in this case directly from the finding of facts set forth by the district court following the bench trial. As part of the Agreement, American paid ARC $1,534,796.06 for ARC's assets, of which the primary assets were its asset cylinders. Asset cylinders could vary in type and cost. For instance, some cylinders are designed to hold compressed gas, and others hold compressed liquids, and the cost can vary from as low as $30 per cylinder to as high as $1,200 per cylinder. Businesses can profit from cylinders such as these by renting them to businesses in need of compressed gas for use in their operations, including restaurants or convenience stores which rent carbon dioxide cylinders for soda fountains that must then be refilled on a regular basis. As a result, a critical factor in determining the appropriate price for the sale of ARC's assets was the number of asset cylinders that could be transferred. The sales price was based in part on McCormick's representation that there would be approximately 6,500 cylinders. The parties could not ascertain a precise count of the cylinders that would be transferred because many cylinders were "out in the field" with customers, and therefore the Agreement provided that American would hold back $150,000—known as the Cylinder Deferred Payment—for 180 days to protect against a marginal shortage of up to 1,200 cylinders, at a valuation of $125 per cylinder. In American's experience, a 1,200-cylinder cushion was more than sufficient to

protect against any shortage that might occur, and ARC did nothing to dissuade American from that belief.

The contract required American to engage in an audit to count and verify the number of asset cylinders in the possession of ARC and its customers that would be transferred under the contract. American conducted the audit between December 2014 and May 22, 2015. The audit started with a personal physical count of the "dock stock," encompassing the cylinders on-site at the Vincennes facility, which yielded 1,553. American then audited the cylinders in the field with the 1,233 customers whose accounts were transferred from ARC to American. To audit those remote accounts, American first reviewed each customer's payment history, and if the records revealed that the customer consistently paid rent on a certain number of cylinders and did not include a large number of exchanges, then American provided full credit for that number of cylinders and would generally not visit that customer to confirm the count. Where the records indicated a large number of cylinder exchanges or abnormalities in the records provided by ARC, American would perform a physical audit where an American representative would visit the customer's location, meet with the customer, locate the cylinders, record the number on cylinder reconciliation forms, and obtain the customer's signature confirming that information.

The audit also included cylinders that were in the field pursuant to 99-year leases with customers. For those accounts, American would send a letter to customers seeking verification of the count listed in the records, and if the customer verified that count, then American provided full credit to ARC. If there was a discrepancy in the count, or if the customer failed to respond, American would follow up and often

conduct an in-person audit. One further adjustment to the cylinder amount was required. Following its acquisition of the asset cylinders, American began sending monthly cylinder rent bills to the customers it acquired from ARC. It subsequently learned that a significant percentage of ARC's customers were no-rent customers, who paid only to have cylinders refilled but did not pay rent to ARC on the ARC-owned cylinders they were using. Such no-rent cylinders were not considered asset cylinders under the Agreement unless retrieved.

According to the Agreement, settlement of the Cylinder Deferred Payment was to occur on or before April 15, 2015. Ron Adkins, American's President and Chief Executive Officer, informed McCormick that the audit was taking longer than anticipated, that the count was coming up shorter than anticipated, and that it wanted to continue counting in order to find every available cylinder. The continuation of the audit was mutually beneficial, in that the more cylinders included in the final count, the more American could earn and the smaller ARC's shortfall would be. The district court found that McCormick extended the deadline and therefore that American, in finishing the audit on May 22, 2015, did not miss the contractual deadline for completing the audit and proposing a "settlement" of the Cylinder Deferred Payment. The results of the audit revealed that ARC owned and transferred 4,663 asset cylinders to American, 1,837 cylinders short of the 6,500 promised in the Agreement. Following that audit, ARC claimed that 16 uncounted cylinders were discovered at Landree Mine, and American stipulated to provide a 16-cylinder credit to ARC. Beyond that number, ARC has provided no affirmative proof that the cylinder count as to any of the customers was flawed.

ARC argued to the district court that American breached the contract because it did not complete the audit within the 180-day period, and that American as a result owed the $150,000 amount allocated as a holdback for the Cylinder Deferred Payment. The district court rejected that argument on two independent grounds. First, the court held that American did not miss the deadline for proposing a settlement, because McCormick extended that deadline through at least May 28, 2015, at which point American had completed its audit and proposed the settlement of the Cylinder Deferred Payment. Second, the court held that the deadline ensured that, if ARC delivered enough cylinders to warrant recovery of some or all of the Cylinder Deferred Payment, ARC would receive payment by that deadline. The court held that if less than 5,300 cylinders were delivered, they would not be entitled to any of the $150,000 payment. Because only 4,663 cylinders were delivered, the court held that regardless of the deadline, the failure to deliver more than 5,300 cylinders meant that they were never entitled to receive any portion of the $150,000 Cylinder Deferred Payment. The court therefore rejected ARC's claim for damages for breach of contract.

Based on that same reasoning, the court granted American's counterclaim for breach of contract. Because the audit reflected that ARC owned only 4,663 cylinders, and because American stipulated to count the cylinders at Landree Mine, the court held that American was entitled to retain the entire $150,000 Cylinder Deferred Payment and to recover $125 for each cylinder it failed to receive under the threshold of 5,300 covered by that Cylinder Deferred Payment contingency for a total of $77,625. From that amount, the district court subtracted the $43,859.48 that American admitted it owed in con-

nection with the settlement of the accounts receivable and entered judgment in favor of American in the amount of $33,765.52 plus interest.

ARC now appeals the court's decision. In an appeal from a bench trial, we review the district court's findings of fact for clear error, and its conclusions of law de novo. *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 379 (7th Cir. 2010). "Under Indiana state law, the court's goal in interpreting a contract is to 'give effect to the parties' intent as reasonably manifested by the language of the agreement.'" *Id.*, quoting *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008). Unless terms of a contract are ambiguous, the court will give the terms their ordinary and plain meaning. *Id*. The district court met that standard in this case, interpreting the contract consistent with the plain and ordinary meaning of the words.

ARC argues that the district court erred in determining that McCormick extended the deadline for the completion of the audit. According to ARC, the Agreement could not be extended by McCormick because it was fundamentally a contract for the sale of goods and the Uniform Commercial Code (UCC) prohibits the oral modification of such contracts, and because the parol evidence rule forbids oral modification of contracts such as the Agreement that are totally integrated and expressly prohibit oral modifications. It further argues that American breached the contract by failing to tender a verified count within the required time period.

American contests both the applicability of the UCC to the Agreement, and the argument that an oral modification was prohibited. But we need not address those issues at all. The district court based its judgment on two separate grounds.

The first related to whether the deadline for the audit was extended by McCormick on behalf of ARC. The second basis, however, was independent of whether the deadline was extended. Recognizing the structure of the contract, the court held that the purpose of the deadline was to ensure timely payment to ARC if more than 5,300 cylinders were delivered, but because the audit at no time revealed more than 5,300 cylinders, the court held that ARC was entitled to no recovery and the Cylinder Deferred Payment provisions were not owed.

ARC does little to contest the latter basis for the district court's judgment, and it is controlling here. The contract provisions at issue, Article 2, § 2.1(f) of the Agreement, provides in relevant part:

> Asset Cylinders. The Asset Cylinders in the possession of Seller and in possession of customers shall be counted and verified as part of the inventory under Section 2.1(e) above. The base number of Asset Cylinders is 6,500 units. The parties agree that the Asset Cylinders will not be verified to the satisfaction of the Purchaser prior to Closing, therefore, $150,000.00 of the Purchase Price shall be deferred for 180 days (the "Cylinder Deferred Payment"). After the 180 [-day] cylinder reconciliation period, any shortage of Asset Cylinders shall be charged at the rate of $125.00 per unit against the Cylinder Deferred Payment, and any excess of Asset Cylinders will be added at the rate of $125.00 per unit to the Cylinder Deferred Payment. The balance of the Cylinder Deferred Payment, if any,

shall be paid to the Seller plus interest at 4% per annum from the Effective Date to date of settlement. Settlement of the Cylinder Deferred Payment shall take place not more than fifteen (15) days following the end of the cylinder reconciliation period. …

First, ARC asserts that the language of that provision requires the audit to be completed within 180 days, and that the entire $150,000 Cylinder Deferred Payment is owed to it if American fails to complete the audit by that deadline. That reads language into the provision that is not there. The provision sets forth the 180-day period for the audit, but it never contemplates as a consequence for exceeding that time period, forfeiture of the entire $150,000 Cylinder Deferred Payment. The damage to ARC for the failure to complete the audit in the 180 days is the delay in its receipt of any funds owed to it of that $150,000 Cylinder Deferred Payment. Therefore, if the ultimate audit had yielded an asset cylinder count that exceeded 5,300, then ARC could claim that American owed it damages for the delay beyond that 180 days in paying it the amount owed, likely in the form of interest. See *Checkers Eight Ltd. P'ship v. Hawkins*, 241 F.3d 558, 562 (7th Cir. 2001) ("[a]bsent exceptional circumstances, actual damages caused by monetary payments being late are not difficult to measure because interest rates can be used to estimate the time value of money."); *Farah, LLC v. Architura, Corp.*, 952 N.E. 2d 328, 337 (Ind. Ct. App. 2011) ("A party's recovery for breach of contract is limited to the loss actually suffered, and the party may not be placed in a better position than he or she would have enjoyed if the breach had not occurred."). Nothing in that provision, however, indicates that the failure to comply will result in a forfeiture of the entire $150,000 amount.

Throughout the provision, the $150,000 amount is characterized as a deferred payment for the total number of cylinders produced. It does not purport to be a liquidated damages provision for failure to comply with the timeliness requirement of the audit, although ARC would have the court treat it as such. "Liquidated damages refers to 'a specific sum of money that has been expressly stipulated by the parties to a contract as the amount of damages to be recovered by one party for a breach of the agreement by the other, whether it exceeds or falls short of actual damages." *Officer v. Chase Ins. Life & Annuity Co.*, 541 F.3d 713, 716 (7th Cir. 2008), quoting *Time Warner Entm't Co. v. Whiteman*, 802 N.E.2d 886, 893 (Ind. 2004). Typically, a liquidated damages clause provides for the forfeiture of a specified sum of money upon breach without proof of damages. *Time Warner*, 802 N.E.2d at 893. The language in the contract in this case does not allocate any amount to be forfeited for the failure to complete the audit in the specified time. ARC has pointed to no evidence to call into question the court's conclusion that "the purpose of the deadline was to ensure that if Plaintiffs delivered enough cylinders to warrant recovery of some or all of the Cylinder Deferred Payment, they would receive payment by that deadline," and that if they produced fewer than 5,300 cylinders, they would not be entitled to any of the $150,000 deferred payment. The audit reflected a significant shortfall in the 6,500-cylinder amount envisioned in the Agreement, and the 4,663 cylinders accounted for was far below the 5,300 threshold that would trigger the Cylinder Deferred Payment. Because ARC was not entitled to any of the Cylinder Deferred Payment in that it provided less than the 5,300 cylinders, it could not have been damaged by the delay in completing the audit. When zero

dollars are owed, the failure to pay it earlier is without consequence.

ARC asserts that reading the provision as entitling it only to damages related to the delay would allow American to reap a windfall, because it could choose to never complete the audit and would not have to pay the $150,000 Cylinder Deferred Payment. That argument is meritless. The issue as to the appropriate damages if American entirely failed to conduct the audit at all is distinct from the issue of the damages that would be appropriate if there was merely a delay in completing the audit, and nothing in the contract remotely suggests that American could choose to forego the audit entirely and retain the $150,000 amount. There is no argument here that American did not act in good faith in its adherence to the audit requirement of the contract.

ARC maintains, however, that the audit requirement of the contract was not met because American never physically inspected and counted each asset cylinder. ARC insists that absent such physical inspection of each of the approximately 6,500 alleged asset cylinders, American failed to complete the audit mandated by the contract. But nothing in the contract purports to limit the audit to physical inspections. The contract requires only that the "[t]he Asset Cylinders in the possession of Seller and in possession of customers shall be counted and verified as part of the inventory under Section 2.1(e)." The manner in which those asset cylinders shall be counted and verified is not specified, and no requirement of physical verification is included. The means of counting the asset cylinders set forth by the district court reflected a reasonable means of ascertaining a trustworthy count entirely

consistent with the "count and verify" requirement. For instance, American physically counted the asset cylinders at the Vincennes site, and credited ARC with the full amount of asset cylinders it claimed for each customer in the field where the pattern of payments and exchanges corroborated those numbers. Where a large number of exchanges or record abnormalities raised questions as to the proper count, physical verification of the asset cylinders was conducted. American, then, credited the records provided by ARC, and confirmed the numbers where the validity of those records was questionable. Nothing in the contract precludes that approach as a means of counting and verifying the asset cylinders in the possession of the Seller and the customers, and in fact, the reliance on and acceptance of ARC's records would presumably benefit ARC. Other than the 16 cylinders in the mine, which American credited, ARC has identified no instance in which the numbers reached were inaccurate. The court's finding that the audit was completed on May 22, 2015, was consistent with the record and certainly was not clearly erroneous.

Even given the court's determination that the audit was valid, ARC argues that the court erred in awarding damages to American. First, ARC asserts that the damage award is improper because ARC never promised to deliver a certain number of cylinders but rather pledged only to transfer all of the cylinders in its possession which was expected to total approximately 6,500. Under this reasoning, a shortfall, no matter how substantial between that 6,500 number and the actual number transferred, would not entitle American to any compensation. The language of the contract, however, supports the district court's contrary interpretation. The contract provides for payments to be made based on the degree to which the asset cylinder count deviated from 6,500 providing that

"any shortage of Asset Cylinders shall be charged at the rate of $125.00 per unit against the Cylinder Deferred Payment, and any excess of Asset Cylinders will be added at the rate of $125.00 per unit to the Cylinder Deferred Payment." The shortfall in this case was so substantial that it exceeded the $150,000 held in reserve as a Cylinder Deferred Payment. The district court did not err in holding that the contract contemplated the payment of $125 to American for each asset cylinder below that 6,500 number, first in the form of a credit to the Cylinder Deferred Payment and then, when that source was depleted, in the form of damages payable from ARC to American. Nor is there any support for ARC's bald contention that the $150,000 Cylinder Deferred Payment was a liquidated damages provision which limited American's recovery to retention of that $150,000 amount. Nothing in the contractual language supports that argument. See *Officer*, 541 F.3d at 716.

Finally, ARC claims that the district court erred in basing its damage award on a $125 valuation for the cylinders. ARC asserts that the valuation cannot be proper because if all 6,500 asset cylinders were valued at $125, the total of $812,500 would greatly exceed the contract price for all of ARC's fixed assets and asset cylinders of $603,905. As ARC recognizes, however, asset cylinders can vary in value from $30 to $1,200 each, and therefore the value of the asset cylinders which ARC failed to provide would depend on the cylinder type. The parties to the contract determined that the cylinders should be valued at $125, with that amount deducted from the Cylinder Deferred Payment for a shortfall or added to the Cylinder Deferred Payment if the asset cylinder number exceeded 6,500. The court did not err in using the valuation for the cylinders that the parties themselves deemed the proper number.

The decision of the district court is AFFIRMED.