In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 18-2926

ALARM DETECTION SYSTEMS, INCORPORATED,

*Plaintiff-Appellant,*

*v.*

ORLAND FIRE PROTECTION DISTRICT, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-00876 — **Thomas M. Durkin**, *Judge.*

———————————

ARGUED APRIL 8, 2019 — DECIDED JULY 15, 2019

———————————

Before WOOD, *Chief Judge*, and SCUDDER and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. This appeal is one of two we decide today regarding the market for commercial fire-alarm services in Chicago's suburbs. Here we are concerned with the Villages of Orland Park and Orland Hills (the "Villages") and, to a lesser extent, Bloomingdale and Lemont.

In 2014, citing safety concerns, the Villages passed ordinances that require commercial buildings to send fire-alarm signals directly to the local 911 dispatch center. This decision, sensible as it may seem, comes at an economic cost: either by design or due to technological restraints, the ordinances allow only one alarm-system provider to operate in the Villages. That provider is Tyco Integrated Security, LLC. It services the area pursuant to an exclusive agreement with the Villages' dispatch center, Orland Fire Protection District.

One of Tyco's competitors, Alarm Detection Systems, Inc. ("ADS"), filed this suit against Orland Fire, Tyco, and another dispatch center, DuPage Public Safety Communications ("Du-Comm"), among others. It brought a host of claims, including ones under the Illinois Fire Protection District Act (the "District Act"), the Sherman Act, and the Fourteenth Amendment—all with the goal of breaking Tyco's hold on the market.

The district court decided for the defendants. After dismissing the District Act claims at summary judgment, it concluded after a bench trial that the Sherman Act claims fail because they are premised on the unilateral actions of the Villages—which ADS did not sue—and that the Fourteenth Amendment claims lacked merit. We agree and affirm.

## I. Background

In Illinois, local laws often require commercial buildings and apartment complexes to maintain fire-alarm systems. The buildings and complexes—or "accounts," as the parties call them—contract directly with the alarm-system providers to install and maintain the systems. The National Fire Protection

Association's National Fire Alarm and Signaling Code (NFPA 72) sets the nationwide standard for these systems.

Should a system detect fire or smoke, local 911 dispatch centers are responsible for receiving distress calls and sending services. The dispatch center in the Villages and Lemont is Orland Fire. It is what is called a "fire-protection district," established under the District Act. 70 ILCS 705/1 *et seq.* The District Act requires fire-protection districts, like Orland Fire, to operate consistent with nationwide standards, like NFPA 72. *See* 70 ILCS 705/11. In Bloomingdale, Du-Comm is the dispatch center. Du-Comm is not a fire-protection district, but a different creature of Illinois law—an "intergovernmental cooperation," formed by several municipal members, including Bloomingdale. 5 ILCS 220/3.

The logistics of the fire-alarm systems are important to this appeal. Each account's system has essentially three parts: heat or smoke detectors, a panel, and a transmitter. When a detector goes off, it sends an alert to the panel. The panel then connects to the transmitter. The transmitter, in turn, sends a radio signal to one of two places: (1) a central-supervising station run by the alarm-system provider (the "CSS model"); or (2) a remote-supervising station operated by the local dispatch center (the "RSS model"). Which model applies depends on the account and its provider's arrangement or, as here, what the local ordinance requires.

Both the CSS model and the RSS model comply with NFPA 72. *See NFPA 72: National Fire Alarm and Signaling Code* §§ 3.3.282.1, 3.3.282.3 (2016 ed.). If a CSS model is in place, a CSS operator will receive the signal from the property's radio; and if the operator determines that the signal was not a false alarm or a maintenance problem, the CSS calls the dispatch

center, which in turn sends help. If, however, the signal goes to the RSS, the RSS either contacts the account directly or sends help. That is why the RSS model is often called a "direct connect" system: accounts send their signals directly to the RSS dispatch center. Alarm-system providers, in addition to their contracts with the accounts, contract with dispatch centers to provide the necessary signal-receiving equipment.

In an RSS model, unlike a CSS model, the dispatch center and the account usually must share an equipment provider. This, according to the record and the district court's findings, is because the dispatch center's receiving equipment operates on FCC-licensed radio frequencies. For that equipment to receive the signal coming from the property, it must operate on the same frequency. And the equipment provider, like Tyco, owns the frequency licenses.

This is at least the current state of play. ADS, however, insists that alternative methods are feasible. First, it asserts that its CSS can instantaneously send alert signals it receives from accounts to the RSS through a process called "automatic retransmission." Doing so, ADS believes, would have the same effect as a signal that is sent directly from the accounts to the dispatch center, as in an RSS model. Second, it claims that it can share a radio frequency with the RSS's alarm-system provider, and thus, its transmitters can send signals directly to the RSS. Neither alternative has, to date, taken hold in the areas with which this appeal is concerned.

That summarizes the technical background. There is an important legal backdrop, too. Alarm-system providers, and ADS specifically, are no strangers to this type of litigation. Two of our past decisions, in which both ADS and Tyco's predecessor, ADT Security Services, Inc., were plaintiffs, feature

prominently in ADS's current claims. *See ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492 (7th Cir. 2012) (*ADT I*); *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 724 F.3d 854 (7th Cir. 2013) (*ADT II*).

*ADT I* and *ADT II* concerned another fire-protection district, the Lisle-Woodridge Fire Protection District. The question we faced was whether an ordinance set by the district exceeded NFPA 72, and, by extension, the district's authority under the District Act. We focused on two facets of the ordinance: it (1) mandated an RSS model and (2) required accounts to purchase equipment from Lisle-Woodridge or its exclusive partner. In *ADT I*, we decided that NFPA 72 permitted an RSS model (there also characterized as a "direct connect" model). But NFPA 72 did not permit the district to order accounts to purchase equipment from it or its exclusive partner. 672 F.3d at 500–03. We then remanded the case for further fact finding. After that fact finding, in *ADT II*, we affirmed the district court's decision that the district was not in fact operating an RSS model or any other form of NFPA 72-approved supervision; it was, instead, routing signals through an intermediary. The district's scheme therefore violated NFPA 72 and by extension the District Act. 724 F.3d at 868–71.

*ADT I* and *ADT II* caused fire-protection districts and municipalities in the greater Chicagoland area to reconsider their protocols. Orland Fire and the Villages were among them. Since 2006, Orland Fire had operated under an ordinance it issued requiring that systems "directly connect" to Orland Fire. To make that RSS model work, Orland Fire entered into an exclusive contract with Tyco. The contract made Tyco the sole provider of equipment to Orland Fire and of transmitters to the accounts. The contract also required the accounts to

contract directly with Tyco, and Orland Fire and Tyco would share in the monitoring fees.

After *ADT I* and *ADT II*, Orland Fire amended its ordinance, rescinding the direct-connect requirement, and requiring only compliance with NFPA 72. But in 2014 and 2015, the Villages amended ordinances of their own. Those ordinances (which we will refer to as the "Ordinances") mandated an RSS system and designated Orland Fire as the designated dispatch center. Orland Fire soon after renewed its exclusive contract with Tyco for a three-year term. In 2017, the parties renewed the contract again with a one-year term subject to automatic renewals.

As a result of the renewed contracts and the new Ordinances, the Villages essentially returned to the status quo: the accounts had to comply with an RSS system and, because of the exclusive contract, Tyco would be their equipment provider. Tyco currently provides systems to almost all of the 650 accounts in the Villages. Tyco bills accounts $89 per month for its services on average, $23.50 of which is remitted to Orland Fire in consideration for the exclusivity arrangement. ADS charges less for its CSS services—$55 per month, on average. The district court did, however, find that RSS models are more expensive to maintain than CSS models, because a single CSS can monitor multiple jurisdictions at a time, unlike a dispatch center acting as an RSS.

Frustrated that despite *ADT I* and *ADT II* it was still locked out of the market, ADS filed this suit. ADS alleged more than 16 claims, but the relevant ones here are those brought under the District Act, the Sherman Act, and the Fourteenth Amendment. It claimed that Orland Fire and Du-Comm were collecting excessive fees in Bloomingdale and Lemont in violation of

the District Act. It also claimed that Orland Fire and Tyco's arrangement violated § 1 and § 2 of the Sherman Act. ADS further claimed that Orland Fire acted arbitrarily, in breach of the Fourteenth Amendment's guarantee of substantive due process, by denying ADS the chance to use automatic retransmission or frequency sharing.[1]

ADS did not, however, sue the Villages. It accepts that the Ordinances are lawful.

The district court resolved ADS's claims at summary judgment and after a bench trial. At summary judgment, the district court ruled that the District Act did not provide a right of action for ADS. After a six-day bench trial, the district court issued a thorough opinion and found that the Sherman Act claims failed because Orland Fire and Tyco's conduct was a necessary consequence of the Villages' Ordinances. The court ruled that the Fourteenth Amendment claims failed because, similarly, Orland Fire did not act irrationally, but rather as the Ordinances required.

ADS appeals. We consolidated the case with *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, No. 18-3316, which concerns a similar market and ordinance. But deciding the appeals requires addressing different legal, factual, and procedural questions, so we issue this opinion independently.

## II. Discussion

On appeal, ADS tries to revive its District Act, Sherman Act, and Fourteenth Amendment claims. But it makes a broader argument, too. *ADT I* and *ADT II*, ADS says, should

---

[1] ADS also brought state tort law claims, which the district court disposed of after trial. ADS does not pursue these claims on appeal.

guide our way in analyzing the current claims. And, ADS continues, in this case, as in those cases, we should condemn a local effort to concentrate the alarm-system market in the hands of one provider.

*ADT I* and *ADT II* do not control this appeal. Those decisions concerned a fire-protection district's ability to mandate a particular RSS model under the District Act. This case centers on the Villages' Ordinances, which are not subject to the District Act and, as ADS concedes, are lawful. This case, moreover, concerns an argument never raised in *ADT I* or *ADT II*—that there is no private right of action under the District Act for companies like ADS. This case also poses antitrust and constitutional questions that *ADT I* and *ADT II* never reached.

We thus address ADS's claims from square one, taking them in turn.

## A. The Fire Protection District Act

The district court dismissed the District Act claims for want of a private right of action. Because that decision was made at summary judgment, we review it de novo. *Levitin v. Nw. Cmty. Hosp.*, 923 F.3d 499, 501 (7th Cir. 2019).

Statutes can provide either express or implied rights of action—or none at all. The District Act does not provide an express right, all agree. To determine whether it provides an implied right of action, we look to Illinois law. *See, e.g.*, *Patel v. Zillow, Inc.*, 915 F.3d 446, 448 (7th Cir. 2019) (looking to Illinois law to determine whether an Illinois statute created a nonstatutory right of action). Though we do so cautiously, recognizing that imputing a right of action where the state was silent assumes "policy-making authority" that is better suited for the state's legislature. *Helping Others Maintain Envtl. Standards*

*v. Bos*, 941 N.E.2d 347, 363 (Ill. App. Ct. 2010). Under Illinois law, courts imply a cause of action when:

> (1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for violation of the statute.

*Metzger v. DaRosa*, 805 N.E.2d 1165, 1168 (Ill. 2004). None of those factors is present here.

The Illinois legislature enacted the District Act to create fire-protection districts. 70 ILCS 705/1. The Act governs the exercise of the districts' authority to purchase equipment, *id.*, adopt safety codes and protocols, 70 ILCS 705/11, and employ firefighters and collect needed funds for their operation, 70 ILCS 705/6. All of this is geared toward a clearly articulated, broader purpose: "to protect the health, safety, and welfare *of the public* by ensuring the provision of adequate fire prevention and control services." *Wauconda Fire Prot. Dist. v. Stonewall Orchards, LLP*, 828 N.E.2d 216, 224 (Ill. 2005) (citing 70 ILCS 705/1) (emphasis added).

ADS, however, uses the statute for a much different end— to protect competition in the alarm-system market. Nowhere in the lengthy District Act is there evidence of a concern for competition, let alone care for the commercial welfare of competing alarm-system providers. ADS, it follows, is not a member of the protected class (public residents), its competition-related injury is not one the District Act is geared to protect against (fire-related damage or harm), and making a

competition claim out of the District Act would not be consistent with its purpose (fire safety). Nor does ADS offer a reason why, but for its right of action, violations of the Act will go unremedied. We therefore find no implied right of action for ADS under the District Act.[2]

ADS's counterarguments are unpersuasive. To start, ADS relies on three cases: *Gaffney v. Bd. of Trustees of Orland Fire Prot. Dist.*, 969 N.E.2d 359 (Ill. 2012), *Wilkes v. Deerfield-Bannockburn Fire Prot. Dist.*, 399 N.E.2d 617 (Ill. App. Ct. 1979), and *Glenview Rural Fire Prot. Dist. v. Raymond*, 311 N.E.2d 302 (Ill. App. Ct. 1974). But these cases do not address an implied right of action under the District Act. *Glenview* and *Gaffney* do not even involve a *claim* under the Act. *See Glenview*, 311 N.E.2d at 303–306; *Gaffney*, 969 N.E.2d at 368–69. And *Wilkes* is equally unhelpful. It was brought by firemen claiming, essentially, that a fire-protection district's operation of an ambulance service was a misuse of district resources, which impacted the firemen's pay. 399 N.E.2d at 619, 621–23. Even stretching those facts to say something about an implied right of action—again, an issue not considered by the court—the facts come far closer to touching on the District Act's purpose and operation than ADS's competition-related claims. *See* 70 ILCS 705/1, 705/6.

ADS also makes the novel argument that even if there is no right of action to enforce particular provisions of the District Act, there should be a right to sue when a fire-protection district exceeds its authority under the Act. That is a

---

[2] It does not matter that ADS seeks declaratory, rather than monetary, relief under the District Act. Declaratory relief "presupposes the existence of a judicially remediable right" and thus cannot be pursued without a predicate right of action. *Schilling v. Rogers*, 363 U.S. 666, 677 (1960).

distinction without a difference. A regulated entity exceeds its statutory authority *because* it does not comply with particular statutory limits.

ADS further points to *ADT I* and *ADT II*. It argues that those cases must have recognized an implied right of action, because they addressed thoroughly ADS and other alarm-system providers' District Act claims, which were similar to the ones ADS brings in this case. Again, no party raised the right-of-action argument that now comes to our attention. "[U]nexamined assumptions of prior cases do not control the disposition of a contested issue." *Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 640 (7th Cir. 2015); *see also Fowler v. Butts*, 829 F.3d 788, 792 (7th Cir. 2016); *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 460 (7th Cir. 2006).

ADS, finally, claims estoppel: that the defendants should be estopped from arguing that there is no right of action because Tyco's predecessor litigated and prevailed in *ADT I* and *ADT II*. The district court rejected that argument. It reasoned that no party, on either side, raised the right-of-action issue in *ADT I* or *ADT II*; Tyco did not embrace a side in that litigation that would now lead to unjust results; and it would be especially unfair to impose estoppel against Orland Fire, which was not a party in *ADT I* or *ADT II*. Estoppel is a discretionary call in the district court's purview. *See, e.g.*, *United States v. Trudeau*, 812 F.3d 578, 584 (7th Cir. 2016). And the district court's sound reasoning was well within its discretion.

The limits of our holding should be noted. We do not foreclose any implied right of action in the District Act. But the District Act gives no reason to oblige ADS's claim, premised on enforcing competition in the alarm-system market.

## B.  The Sherman Act

The district court also found for the defendants on ADS's Sherman Act claims. *See* 15 U.S.C. §§ 1, 2. It concluded that ADS's exclusion from the market was the result of the Ordinances, not the defendants' anticompetitive behavior. Because that decision came after a trial, we review the court's legal conclusions de novo and its factual findings for clear error. *ARC Welding Supply Co, Inc. v. Am. Welding & Gas, Inc.*, 924 F.3d 322, 325 (7th Cir. 2019).

*Fisher v. City of Berkeley*, 475 U.S. 260 (1986), holds that restraints on trade that are unilaterally imposed by the government do not form the basis of a § 1 claim. *See, e.g., Flying J, Inc. v. Van Hollen*, 621 F.3d 658, 662–65 (7th Cir. 2010). *Fisher*'s facts concerned a local ordinance that set a mandatory rent ceiling for landlords. Landlords sued, arguing, in part, that the Sherman Act preempted the local, anticompetitive ordinance. The Supreme Court accepted that the ordinance was anticompetitive but disagreed that it violated the Sherman Act. The government's ordinance mandated the landlords' effective price fixing, and thus, there was no anticompetitive meeting of the minds for § 1 purposes. *Id.* at 266–67. The ordinance was at fault, not whatever anticompetitive conduct necessarily followed. *Id.*

*Fisher* distinguished such unilateral restraints from "hybrid" restraints, which do fall under § 1. The difference between the two, according to *Fisher*, is the extent of the government's command. If the government exercises "complete control" through the restraint, the conduct is not coordinated. *Id.* at 269. If, on the other hand, private parties are granted "a degree of private regulatory power," pursuant to which they behave anticompetitively, "the regulatory scheme may be

attacked under § 1." *Id.* at 267–68 (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 666 n.1 (1982)); *see also* AREEDA & HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 217 (2018 ed.) ("key" to *Fisher* is whether the government exercised "direct" control under the regime). *Fisher* contrasted the rent-control ordinance, a unilateral government action, with a hybrid restraint it had addressed before: local laws that require liquor distributors to set shared prices, but do not set *what* those prices are. *Id.* at 268–69 (citing *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980); *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384 (1951)); *see also 324 Liquor Corp. v. Duffy*, 479 U.S. 335 (1987) (similar, post-*Fisher* hybrid restraint).

*Fisher*'s teachings control here. It is true that, unlike *Fisher*'s rent-control ordinance, the Villages' Ordinances do not, on their face, mandate the challenged anticompetitive conduct—exclusivity with Tyco. But we do not see why that distinction matters here. *Fisher* was concerned with a law's coercive effect, not its facial interpretation. *See* 475 U.S. at 266–67; *see also Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 890 (9th Cir. 2008) (*Fisher* applies when "the potential anti-competitive effect is not the result of private pricing or marketing decisions, but the *logical and intended* result of the statute itself") (emphasis added). As long as the law "leave[s] nothing further to be decided" by private parties, there can be no concerted action. AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 221e4.

Here, the district court found, after carefully reviewing the record evidence and hearing testimony, that implementing an RSS protocol, which the Ordinances *do* mandate on their face,

required an exclusive arrangement with an alarm-system pro-
vider. This was true, according to the district court, as a tech-
nological and economic matter. Radio signals operate on one
frequency that is licensed by a provider. So to ensure that ac-
counts can send signals directly to the dispatch center, as an
RSS protocol requires, the accounts and the center must share
a provider—that is, there must be exclusivity. That exclusiv-
ity, moreover, could come as no surprise to the Villages. Ex-
clusivity was the status quo under Orland Fire's previous
RSS-mandating ordinance. *Fisher* therefore dictates that the
defendants did not violate § 1.

In contending otherwise, ADS insists that its alternative
modes can operate in an RSS protocol and, thus, comply with
the Ordinances. We are skeptical about the practical feasibility
of those alternatives. Automatic retransmission in fact means
that the signal goes first to the CSS and second to the RSS,
however quickly. *See ADT II*, 724 F.3d at 868. More troubling,
a ruling that requires the market's participants to make fre-
quency-sharing available, as ADS seems to request, would
mean demanding that Tyco sublicense its frequencies to its
competitors. Antitrust law usually frowns upon such duties
to deal. *See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S.
438, 450 (2009); *Verizon Commc'ns Inc. v. Law Offices of Curtis V.
Trinko, LLP*, 540 U.S. 398, 410 (2004).

We can set aside that skepticism, though, because again
the district court's factual findings resolve the question for us.
The district court considered these alternatives—and rejected
them. The court found that ADS had not supported its claim
that retransmission can comply with an RSS system. It further
found that the evidence of ADS's retransmission capabilities
were "at best inconclusive." And as to frequency sharing, the

district court found that it was flawed. The sublicensing company could not monitor the signals for trouble or maintenance alerts, a critical part of the alarm-system business. ADS shows no clear error in those findings.

ADS makes another argument. Even if the Ordinances effectively mandate exclusivity, ADS argues, they do not control the prices Orland Fire and Tyco charge. Thus, according to ADS, the Ordinances impose at most a hybrid restraint, because the governmental command is not complete. We agree with the factual premise but not the conclusion. The Ordinances do not speak to pricing, it is true, but the anticompetitive conduct ADS's claim challenges is not inflated prices. Tyco's exclusivity is what caused ADS's asserted antitrust injury—exclusion from the market—not high prices, which ADS of course does not pay. *Accord O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 572 (7th Cir. 1994) ("increased prices" cause competitors "no injury, let alone antitrust injury").

ADS also insists that the district court misread the Ordinances, which led it to find that *Fisher* applied. The district court, however, did not decide that the Ordinances on their face require an exclusive arrangement. Instead, the court found, based on the evidence, that an exclusive arrangement was the only feasible way to carry out the RSS model that the Ordinances mandate. A different case, with different evidence, may prove differently. But nothing in this record shows that the district court's findings were in clear error.

*Fisher* thus resolves ADS's § 1 claim—and it resolves the § 2 claim as well. Section 2 prohibits monopolization, or the attempt at it, through willful, anticompetitive conduct. *E.g., Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th

Cir. 2011). The only willful conduct cited by ADS is the exclusivity arrangement. But for reasons just explained, that conduct was not *willful* under *Fisher*; it was effectively required by the Ordinance. *See Englert v. McKeesport*, 872 F.3d 1144, 1150 (3d Cir. 1989) (applying *Fisher* to exclusive-dealing claims under both § 1 and § 2).

One final note. ADS worries that without introducing competition against Tyco the alarm-system market will stagnate; Tyco will have little reason to innovate and more flexibility to charge high prices. We are not unsympathetic to the point, in theory. But ADS had its chance at trial to demonstrate to the district court that its alternative methods can work in an RSS system, and it did not. And no one should lose sight of the fact that competition for the exclusive contract *is* competition. *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 47 (7th Cir. 1996). Orland Fire and Tyco's deal has only a one-year, renewable term, and nothing we know of forecloses ADS from making a bid to Orland Fire for another deal.

## C. The Fourteenth Amendment

The district court further found for Orland Fire on ADS's substantive due process claims. This decision, like the Sherman Act decision, came in the posttrial ruling, so we review the legal conclusions de novo and the factual findings for clear error. *ARC Welding Supply*, 924 F.3d at 325.

Because ADS does not invoke a fundamental right, the exclusion of ADS from the Schaumburg market need only be rationally related to a legitimate government interest. *Washington v. Glucksberg*, 521 U.S. 702, 727 (1997); *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014).

This is a lenient standard, and laws challenged under rational-basis review carry a "strong presumption of validity." *Minerva Dairy, Inc. v. Harsdorf*, 905 F.3d 1047, 1053 (7th Cir. 2018); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013).

ADS's substantive due process claim can be easily rejected. It asserts that Orland Fire has acted arbitrarily and irrationally by going with an exclusive provider rather than entertaining ADS's efforts at alternative, RSS-compliant methods. But ADS accepts that the Ordinances are lawful. And for reasons explained in the last section, we have no reason to disturb the district court's sound findings that the Ordinances effectively require Orland Fire to work with an exclusive provider. There was thus a rational basis for Orland Fire to choose an exclusive provider—abiding by municipal command.

### III. Conclusion

For these reasons, we affirm the district court's judgment.